UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JACK WILLIAMS and CARI WILLIAMS,

    Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY and DOES 1 through 25,

    Defendants.

No. 2:09-cv-01023-MCE-DAD

**MEMORANDUM AND ORDER**

----oo0oo----

Through the present lawsuit, Plaintiffs Jack Williams and Cari Williams ("Plaintiffs") seek damages from their homeowners' insurance carrier, Defendant Allstate Insurance Company ("Allstate"), as a result of Allstate's denial of coverage for alleged windstorm-related loss to the roof of Plaintiffs' home in Gridley, California.  Presently before the Court is Allstate's Motion for Partial Summary Judgment/Summary Adjudication as to Plaintiffs' claim for breach of the covenant of good faith and fair dealing, and their request that punitive damages be imposed against Allstate given their handling of the subject claim. As will be set forth below, Allstate's Motion will be denied.

1

**BACKGROUND**

On the nights of January 3 and 5, 2008, a significant windstorm struck the area around Plaintiffs' home in Gridley, California. Newspaper reports indicated extensive damage. A storm gauge mounted on the roof of Plaintiffs' neighbor, Lyndol Swartz, reported wind speeds at 89 m.p.h. before the roof where the measurement device was located blew off. As a result of the storm, Plaintiffs claim to have sustained various wind-related losses, including damage to certain outbuildings as well as structural damage to the roof and other components of their home itself. Plaintiffs had a policy of homeowners' insurance issued by Allstate and submitted a claim for their losses. Given the magnitude of the storm and the number of claims made, Allstate assigned its National Catastrophe Team to the region.

The Allstate Claims Consultant assigned to handle the claim, Daniel Brett King, proceeded to retain Rimkus Consulting Group to assess causation in determining whether Plaintiffs' damage was covered under Allstate's policy. While the Allstate policy covered "sudden and accidental direct physical loss", it nonetheless contained various exclusions to that coverage grant, including exclusions for wear and tear, deterioration, and latent defect. See Allstate Policy, Ex. A to Pls.' Compl.

Tony Wu, a civil structural engineer employed by Rimkus, inspected Plaintiffs' property and prepared a report dated March 27, 2008.

///
///

Wu concluded that the sagging beams for the cathedral ceiling in Plaintiffs' living and dining rooms, and the separation observed in those beams, was caused not by wind, but rather from overload to the roof rafter system and the attachment at the top plate. Wu believed that the attachment had crept over time and did not think that the subject windstorm, which he described as entailing a maximum gust speed of 56 m.p.h., had caused the damage.  Wu's conclusions in this regard, as well as his report as a whole, were peer reviewed by another Rimkus civil engineer, Diane Hunt. Hunt supported Wu's conclusions, opining that the roof sag occurred over time due to undersized rafters, as well as an improperly installed collar tie that overstressed the ceiling system.

On April 7, 2008, Allstate wrote to Plaintiffs to inform them that the roof/ceiling damage would not be covered. Allstate's letter indicated in pertinent part as follows:

> "Specifically, the following facts are the basis for this decision: Our investigation revealed that there is no structural damage to roof from storm on January 4, 2008.  The damages are not sudden and accidental; they are from insufficient framing due to the span of the room."

See April 7, 2008 letter, Ex. J to the Decl. of George A. Murphy in Opp'n to Mot. for Summ. J.

On April 13, 2008, in response to Allstate's denial of coverage, Jack Williams submitted various statements and letters which contested Allstate's determination, and indicated that the damage at issue did happen suddenly and did not exist until right after the January 4, 2008 windstorm.

///

3

1  The proffered materials included a statement from Rick Miller,
2  who painted Plaintiffs' home in September of 2006.  According to
3  Miller, at that time, just over a year before the 2008 storm, he
4  observed no signs of roof movement.  Miller pointed to the
5  varnish line of his paint job, and the subsequent slippage that
6  occurred, as evidence that movement in the ceiling had occurred
7  after he painted.  See Miller Statement, Ex. 2 to Decl. of Jack
8  Williams in Opp'n to Allstate's Mot. for Summ. J.

9       Jack Williams also submitted a letter signed by Robert
10 Thomas, who, as a computer and network service provider to
11 Plaintiffs, had visited their property some 23 times in December
12 2007 and 23 times during January of 2008.  Thomas stated that at
13 no time prior to the storm did he have any difficulty using
14 either the front or garage door of Plaintiffs' residence, while
15 afterwards they were no longer fully functional and appeared to
16 be misaligned and unbalanced.  Another frequent visitor to
17 Plaintiffs' home, Kim Sorenson, who was also a neighbor, attested
18 to wind gusts in the area up to 100 m.p.h.  He observed the
19 sagging roofline in Plaintiffs' home, as well as the separating
20 open beams and malfunctioning front door, and indicated that in
21 his view "there is no doubt in my mind that the damage to
22 [Plaintiffs'] home [was] due to the high windstorm..."  See
23 Sorenson's letter of March 31, 2008, attached as Exh. 7 to the
24 Williams Decl.
25 ///
26 ///
27 ///
28 ///

4

1    Jack Williams submitted several other statements echoing
2 similar statements, and further forwarded an analysis prepared on
3 February 28, 2008 by his own engineer, Roger Key, who pointed to
4 the extreme storm conditions in concluding that "it seems obvious
5 that the winds of January 4th were the cause of the damage."  See
6 Key's letter, Ex. C to Murphy Decl.

7    Given the wind speeds noted by Plaintiffs as considerably
8 higher than the 56 m.p.h. figure cited by Tony Wu in his report,[1]
9 Rimkus prepared a "Supplemental Report of Findings" dated
10 July 25, 2008.  That report, prepared by Diane Hunt, reaffirmed
11 Wu's original conclusions despite the fact that there was no
12 evidence that Hunt either visited Plaintiffs' property or took
13 into consideration the accounts provided by Plaintiffs' witnesses
14 (with the exception of Roger Key) as discussed above.[2]  Hunt's
15 report was nonetheless peer reviewed and supported by another
16 Rimkus engineer, Ronnie B. McBryde.

17    Significantly, despite his apparent approval of Ms. Hunt's
18 report, which reaffirmed Tony Wu's earlier findings, Mr. McBryde
19 was apparently critical of Wu in failing to include in his report
20 the information provided by Rick Miller concerning the shifting
21 roof, information that arguably was inconsistent with Wu's
22 findings.
23 ///
24

---

25    [1] Plaintiffs' April 13, 2008 letter cited Lyndol Swartz's
26 wind speed measurement at 89 m.p.h. as mentioned above.

27    [2] Other than Roger Key's letter, there is no indication that
any of the other materials provided by Plaintiffs to Allstate
28 following its April 7, 2008 denial of coverage were even given by
Allstate to Rimkus for its review and/or consideration.

5

Significant too is evidence that Wu was terminated by Rimkus within six months after preparing his report in this matter.

Even more troubling for Allstate is the fact that its claims file, despite acknowledging receipt of Jack Williams' April 13, 2008 letter and the attachments thereto, is devoid of the actual documents themselves.  At deposition, the Allstate employee who made the ultimate decision to deny coverage, Daniel Brett King, stated that he did not take into consideration any of those documents (except for Key's letter) in making his determination.  King went so far as to testify that he'd never seen Plaintiffs' eyewitness statements.  See King Dep., 18:13-18; 92:5-94:2; 95:23-103:8; 105:21-106:18.

It appears undisputed that Allstate made no effort to contact any of the witnesses identified by Plaintiff.  Nor did Allstate contact the prior owner of the property, Ross T. Willey, who had the house built.  Willey denied observing any sway/deformity involving the roofline or cathedral ceiling during the more than twenty years he lived in the house before selling it to Plaintiffs in 2000.   See Willey Decl., ¶¶ 5-11.

Through the present Motion, Allstate asks this Court to determine as a matter of law that its reliance on Rimkus' reports was reasonable and that accordingly there is neither any basis for bad faith liability (in the form of a breach of the implied covenant of good faith and fair dealing) nor any basis for an award of punitive damages.

///

///

///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. at 323 (quoting Rule 56(c)).

1  If the moving party meets its initial responsibility, the
2 burden then shifts to the opposing party to establish that a
3 genuine issue as to any material fact actually does exist.
4 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
5 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
6 253, 288-89 (1968).
7  In attempting to establish the existence of this factual
8 dispute, the opposing party must tender evidence of specific
9 facts in the form of affidavits, and/or admissible discovery
10 material, in support of its contention that the dispute exists.
11 Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that
12 the fact in contention is material, i.e., a fact that might
13 affect the outcome of the suit under the governing law, and that
14 the dispute is genuine, i.e., the evidence is such that a
15 reasonable jury could return a verdict for the nonmoving party.
16 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52
17 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper
18 Workers, 971 F.2d 347, 355 (9th Cir. 1987). Stated another way,
19 "before the evidence is left to the jury, there is a preliminary
20 question for the judge, not whether there is literally no
21 evidence, but whether there is any upon which a jury could
22 properly proceed to find a verdict for the party producing it,
23 upon whom the onus of proof is imposed."  Anderson, 477 U.S. at
24 251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.
25 Ed. 867 (1872)).
26 ///
27 ///
28 ///

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

**A. Numerous Triable Issues Of Fact Preclude Any Determination By This Court That Allstate Reasonably Relied On Rimkus' Reports In Denying Coverage**

Through this Motion, Allstate urges this Court to determine as a matter of law that, in handling Plaintiffs' claim herein, it could not have violated the implied covenant of good faith and fair dealing because it reasonably relied on Rimkus Consulting's conclusion that the damages to Plaintiffs' roof could not have been caused by the January 4, 2008 windstorm.

///

1    An insurer breaches the implied covenant of good faith and
2 dealing when it unreasonably denies the payment of policy
3 benefits by doing so without proper cause or reasonable basis.
4 See Chateau Chamberay Homeowners' Ass'n v. Assoc. Int'l Ins. Co.,
5 90 Cal. App. 4th 335, 347 (2001).  "The reasonableness of an
6 insurer's claims-handling conduct is ordinarily a question of
7 fact."  Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d
8 998, 1010 (9th Cir. 2004).  Consequently, an insurer is not
9 entitled to judgment as a matter of law if a jury could conclude
10 the insurer acted unreasonably.  Id.   Case law nonetheless
11 recognizes a defense to liability for breach of the implied
12 covenant if there is a "genuine dispute" involving issues of fact
13 and law.  Provided the requisite "genuine dispute" exists, there
14 can be no liability for breach of the implied covenant, even if
15 the insurer is ultimately found to be responsible for breach of
16 contract.  Id.  Since the "genuine dispute" doctrine can apply
17 where the insurer denies a claim based on expert opinion,
18 Allstate claims here that the doctrine applies given its alleged
19 reliance on Rimkus' reports.  See McCoy v. Progressive Western
20 Ins. Co., 171 Cal. App. 4th 785, 793 (2009).

21    Application of the "genuine dispute" defense is nonetheless
22 not without limits.  "Expert testimony does not automatically
23 insulate an insurer from bad faith claims based on a biased
24 investigation."  Guebara v. Allstate Ins. Co., 237 F.3d 987, 996
25 (9th Cir. 2001).  The adequacy of an insurer's investigation is
26 "[a]mong the most critical factors bearing on the insurer's good
27 faith..."  Shade Foods, Inc. v. Innovative Products Sales & Mktg,
28 Inc., 78 Cal. App. 4th 847, 879 (2000).

10

The duty to investigate thoroughly requires that the insurer interview witnesses who may have significant information. <u>Downey Savings & Loan Ass'n v. Ohio Cas. Ins. Co.</u>, 189 Cal. App. 3d 1072, 1084, 1096 (1987). The insurer must "fully inquire into possible bases that might support the insured's claim." <u>Jordan v. Allstate Ins. Co.</u>, 148 Cal. App. 4th 1062, 1072 (2007).

As the California Supreme Court has explained, the "genuine dispute" doctrine "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim....[and] in the context of bad faith claims allows a court to grant summary judgment [only] when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable – for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." <u>Wilson v. 21st Century Ins. Co.</u>, 42 Cal. 4th 713, 724 (2007). An insurer is consequently not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude the insurer acted unreasonably. <u>Amadeo v. Principal Mut. Life Ins. Co.</u>, 290 F.3d 1152, 1161-62 (9th Cir. 2002).

Here, there are numerous triable issues of fact with respect to whether Allstate's investigation was reasonable and whether it was entitled to rely on Rimkus' reports as a defense to any bad faith liability.

///
///
///

First, with respect to Allstate's investigation, Plaintiffs have cited to evidence suggesting that Allstate failed to interview key witnesses, even after those witnesses had been identified by Plaintiffs, failed for the most part to provide the information it was given to Rimkus, and may have even purged its own claims file of its insured's April 13, 2008 letter and its attachments-information arguably inconsistent with its determination that the windstorm could not have caused the subject damage to Plaintiff's roof and ceilings.  In addition, as Plaintiffs point out, even Rimkus recommended that Allstate authorize destructive testing to further assess the question of causation.  Allstate refused, and limited Rimkus to a visual inspection of the Plaintiffs' roof/ceiling, only.

   Although these shortcomings are enough to render any reliance on the "genuine dispute" doctrine unavailing for purposes of summary judgment, Plaintiffs have also cited to evidence that Allstate regularly used the Rimkus Consulting Group for assessments in determining coverage.  In 2009, the year following its adjustment of the subject claim, Allstate and/or other entities owned by Allstate paid Rimkus Consulting Group a total of $444,564.82 for services rendered.  Robert Sharp, Plaintiffs' insurance handling expert, compared this figure to the $5,210.79 amount paid to Rimkus on the subject claim, and pointed out that the figures, on average, suggest that Rimkus may receive at least 85 assignments per year from Allstate.

///

///

///

1  In Mr. Sharp's opinion, that created a significant financial
2  relationship between Allstate and Rimkus suggesting bias, and
3  making it unreasonable for Allstate to rely exclusively on
4  Rimkus' reports as a basis for denying coverage, particularly in
5  the face of other significant evidence, as discussed above, which
6  brought Rimkus' conclusions into question.  See Decl. of Robert
7  Sharp, ¶¶ 4-8.[3]  Those concerns cannot be discounted for purposes
8  of summary judgment and provide yet another reason for denying
9  Allstate's Motion.

**B.   Allstate's Attempt To Foreclose Any Potential For Punitive Damages In This Matter Also Fails**

As the foregoing sections of this Memorandum and Order already indicate, Plaintiffs point to evidence that Allstate may have concealed information that supported Plaintiffs' contentions as to causation of the subject loss.  Failure to conduct an adequate investigation, standing alone, has been deemed sufficient to withstand summary judgment as to punitive damages.  Harbison v. American Motorists, 636 F. Supp. 2d 1030, 1044 (E.D. Cal. 2009), citing Amadeo Principal Mutual Life Ins. Co., 290 F.3d at 1165.  In Amadeo, the Ninth Circuit affirmed summary judgment under circumstances, like those here, that may suggest a deliberately restricted investigation.  Id.  Significantly, too, Allstate's failure to extend coverage was of substantial import to Plaintiffs' well-being.

---

[3] The Court recognizes that Allstate has objected to the Sharp declaration as not reasonably based on fact or scientific evidence pursuant to Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (2009).  Those objections are overruled.

Plaintiffs claim they constantly worried about the roof collapsing after being told by their contractor that the roofing system was beginning to fail and that rafters were sliding out at the walls. At the same time, they also contend they could not afford to live elsewhere and continue to pay the mortgage on a house they could not sell because of serious damage. Particularly since the propriety of punitive damages is generally left to the discretion of the jury in any event (see id.), this Court cannot determine under these circumstances that punitive damages should not be awarded.

**CONCLUSION**

For all the foregoing reasons, Allstate's Motion for Partial Summary Judgment (ECF No. 30) is hereby DENIED.[4]

IT IS SO ORDERED.

Dated: December 21, 2010

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[4] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

14